# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **CHARLIE STATEN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Case No.:** |
| | ) | |
| **AUSTAL USA, LLC,** | ) | **JURY DEMANDED** |
| | ) | |
| **Defendant.** | ) | |

## COMPLAINT

**COMES NOW** Plaintiff, Mr. Charlie Staten ("Plaintiff" or "Staten"), and files this Complaint against Austal USA, LLC ("Defendant"). As grounds for this Complaint, Plaintiff states the following:

## JURISDICTION AND VENUE

1. This is a suit authorized and brought to secure the protection of and to redress the deprivation of rights secured by Title VII of the Civil Rights Act of 1964, as amended, codified at 42 U.S.C. § 2000e et seq., (hereinafter referred to as "Title VII"), and 42 U.S.C. § 1981.

2. Jurisdiction is invoked pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

3. The unlawful employment practices described herein were committed in Mobile County, Alabama; therefore, venue lies in the United States District Court

for the Southern District of Alabama, Southern Division, pursuant to 28 U.S.C. § 1391(b).

## PARTIES

4.    Plaintiff is a citizen of the United States of America over the age of nineteen (19) years, and currently resides in Mobile County, Alabama.

5.    Plaintiff was, at all times relevant to this complaint, an "employee" of the Company within the meaning of 42 U.S.C. § 2000e(f).

6.    Defendant is a domestic limited liability company with a principal address of 100 Austal Way, Mobile, AL 36602.

7.    During all times relevant to this Complaint, Defendant conducted business in Alabama.

8.    Defendant is an "employer" within the meaning of 42 U.S.C. § 2000e(b) and was, at all times relevant, Plaintiff's "employer."

## ADMINISTRATIVE EXHAUSTION

9.    Plaintiff filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") against Defendant.

10.    Charge number 420-2025-03523 (the "Charge") was filed on June 5, 2025. (Attached hereto as **Exhibit A**).

11.    Plaintiff received the Right to Sue ("RTS") for the Charge on or about January 6, 2026. (Attached hereto as **Exhibit B**).

12. Plaintiff has now filed this Complaint within ninety (90) days of his receipt of the RTS and has, therefore, exhausted all administrative remedies with respect to the Charge before filing his claims with this Court.

## FACTS

13. Plaintiff is a Black male.

14. Plaintiff was hired by Defendant on or around October 31, 2022, to work as a Human Resources ("HR") Specialist.

15. At the time of his termination, Plaintiff was the only Black male in the Employee Relations department.

16. On or around February 25, 2025, Plaintiff and another HR colleague, Colton Burns ("Burns"), met with an employee of Defendant, Antron Valrie ("Valrie"), regarding Valrie's complaints of racial discrimination.

17. Burns is white.

18. During the conversation, Burns told Valrie that he should contact the Employee Relations Manager, Bridget Jewett ("Jewett"), and the HR Vice President, Kristen Parsons ("Parsons"), to schedule a meeting about the racial discrimination.

19. Valrie called Jewett and Parsons to schedule that meeting while Plaintiff was sitting in the office with him.

20. During Valrie's phone call with Jewett and Parsons, Plaintiff and Burns received messages from Jewett instructing them to terminate Valrie that day.

21.     Plaintiff and Burns told Jewett that Valrie's termination did not follow Defendant's disciplinary policy, and that Valrie would need to be issued a write-up and suspended first to be in alignment with Defendant's policy.

22.     Jewett told Plaintiff that she did not want to issue Valrie a write-up and suspension, and instructed Plaintiff and Burns to terminate Valrie anyway.

23.     Plaintiff and Burns terminated Valrie's employment according to Jewett's orders.

24.     During his termination meeting, Valrie asked if he had to sign the termination paperwork if he did not agree with it.

25.     Both Plaintiff and Burns told Valrie that he was not required to sign the termination paperwork if he did not want to.

26.     After this meeting, Jewett told Plaintiff that a formal complaint had been filed against him for not following company policy during the meeting and asked Plaintiff what he told Valrie.

27.     Plaintiff explained that he terminated Valrie according to Jewett's instructions, and that he and Burns told him he was not required to sign the paperwork when he asked.

28.     Burns confirmed Plaintiff's account of what happened during Valrie's termination meeting.

29.    The following day, February 26, 2025, Jewett terminated Plaintiff, alleging poor performance and unprofessional conduct.

30.    Prior to his termination, Plaintiff had never received any negative comments or disciplinary measures regarding his professionalism.

31.    Burns, a similarly situated coworker who engaged in the same conduct as Plaintiff, was not terminated.

32.    Plaintiff has been significantly damaged both financially and emotionally due to Defendant's unlawful actions.

**COUNT I**
**RACE DISCRIMINATION (TITLE VII)**

33.    Plaintiff is Black and he is, therefore, a member of a protected class.

34.    Plaintiff was employed by Defendant as an HR Specialist.

35.    Plaintiff is qualified to do his job as an HR Specialist.

36.    On or around February 25, 2025, Plaintiff and another HR colleague, Burns, met with an employee of Defendant, Valrie, regarding Valrie's complaints of racial discrimination.

37.    Burns is white.

38.    During the conversation, Burns told Valrie that he should contact the Employee Relations Manager, Jewett, and the HR Vice President, Parsons, to schedule a meeting about the racial discrimination.

39. During Valrie's phone call with Jewett and Parsons, Plaintiff and Burns received messages from Jewett instructing them to terminate Valrie that day.

40. Plaintiff and Burns told Jewett that Valrie's termination did not follow Defendant's disciplinary policy, and that Valrie would need to be issued a write-up and suspended first to be in alignment with Defendant's policy.

41. Jewett told Plaintiff that she did not want to issue Valrie a write-up and suspension, and instructed Plaintiff and Burns to terminate Valrie anyway.

42. Plaintiff and Burns terminated Valrie's employment according to Jewett's orders.

43. During his termination meeting, Valrie asked if he had to sign the termination paperwork if he did not agree with it.

44. Both Plaintiff and Burns told Valrie that he was not required to sign the termination paperwork if he did not want to.

45. After this meeting, Jewett told Plaintiff that a formal complaint had been filed against him for not following company policy during the meeting and asked Plaintiff what he told Valrie.

46. Plaintiff explained that he terminated Valrie according to Jewett's instructions, and that he and Burns told him he was not required to sign the paperwork when he asked.

47. Burns confirmed Plaintiff's account of what happened during Valrie's termination meeting.

48. The following day, February 26, 2025, Jewett terminated Plaintiff, alleging poor performance and unprofessional conduct.

49. Prior to his termination, Plaintiff had never received any negative comments or disciplinary measures regarding his professionalism.

50. Burns, a similarly situated coworker who engaged in the same conduct as Plaintiff, was not terminated.

51. Defendant's disparate treatment of Plaintiff leading to the termination of his employment was motivated by Plaintiff's race.

52. Plaintiff has been significantly damaged both financially and emotionally due to Defendant's unlawful actions.

## COUNT II
## RACE DISCRIMINATION (42 U.S.C. § 1981)

53. Plaintiff is Black and he is, therefore, a member of a protected class.

54. Plaintiff was employed by Defendant as an HR Specialist.

55. Plaintiff is qualified to do his job as an HR Specialist.

56. On or around February 25, 2025, Plaintiff and another HR colleague, Burns, met with an employee of Defendant, Valrie, regarding Valrie's complaints of racial discrimination.

57. Burns is white.

58.     During the conversation, Burns told Valrie that he should contact the Employee Relations Manager, Jewett, and the HR Vice President, Parsons, to schedule a meeting about the racial discrimination.

59.     During Valrie's phone call with Jewett and Parsons, Plaintiff and Burns received messages from Jewett instructing them to terminate Valrie that day.

60.     Plaintiff and Burns told Jewett that Valrie's termination did not follow Defendant's disciplinary policy, and that Valrie would need to be issued a write-up and suspended first to be in alignment with Defendant's policy.

61.     Jewett told Plaintiff that she did not want to issue Valrie a write-up and suspension, and instructed Plaintiff and Burns to terminate Valrie anyway.

62.     Plaintiff and Burns terminated Valrie's employment according to Jewett's orders.

63.     During his termination meeting, Valrie asked if he had to sign the termination paperwork if he did not agree with it.

64.     Both Plaintiff and Burns told Valrie that he was not required to sign the termination paperwork if he did not want to.

65.     After this meeting, Jewett told Plaintiff that a formal complaint had been filed against him for not following company policy during the meeting and asked Plaintiff what he told Valrie.

66.    Plaintiff explained that he terminated Valrie according to Jewett's instructions, and that he and Burns told him he was not required to sign the paperwork when he asked.

67.    Burns confirmed Plaintiff's account of what happened during Valrie's termination meeting.

68.    The following day, February 26, 2025, Jewett terminated Plaintiff, alleging poor performance and unprofessional conduct.

69.    Prior to his termination, Plaintiff had never received any negative comments or disciplinary measures regarding his professionalism.

70.    Burns, a similarly situated coworker who engaged in the same conduct as Plaintiff, was not terminated.

71.    Defendant's disparate treatment of Plaintiff leading to the termination of his employment occurred because of Plaintiff's race, and would not have occurred but for Plaintiff's race.

72.    Plaintiff has been significantly damaged both financially and emotionally due to Defendant's unlawful actions.

## COUNT III
## RETALIATION (TITLE VII)

73.    On or around February 25, 2025, Plaintiff and another HR colleague, Burns, met with an employee of Defendant, Valrie, regarding Valrie's complaints of racial discrimination.

74.    During the conversation, Burns told Valrie that he should contact the Employee Relations Manager, Jewett, and the HR Vice President, Parsons, to schedule a meeting about the racial discrimination.

75.    During Valrie's phone call with Jewett and Parsons, Plaintiff and Burns received messages from Jewett instructing them to terminate Valrie that day.

76.    Plaintiff and Burns told Jewett that Valrie's termination did not follow Defendant's disciplinary policy, and that Valrie would need to be issued a write-up and suspended first to be in alignment with Defendant's policy.

77.    Jewett told Plaintiff that she did not want to issue Valrie a write-up and suspension, and instructed Plaintiff and Burns to terminate Valrie anyway.

78.    Plaintiff and Burns terminated Valrie's employment according to Jewett's orders.

79.    During his termination meeting, Valrie asked if he had to sign the termination paperwork if he did not agree with it.

80.    Both Plaintiff and Burns told Valrie that he was not required to sign the termination paperwork if he did not want to.

81.    After this meeting, Jewett told Plaintiff that a formal complaint had been filed against him for not following company policy during the meeting and asked Plaintiff what he told Valrie.

10

82. Plaintiff explained that he terminated Valrie according to Jewett's instructions, and that he and Burns told him he was not required to sign the paperwork when he asked.

83. Burns confirmed Plaintiff's account of what happened during Valrie's termination meeting.

84. The following day, February 26, 2025, Jewett terminated Plaintiff, alleging poor performance and unprofessional conduct.

85. Prior to his termination, Plaintiff had never received any negative comments or disciplinary measures regarding his professionalism.

86. Defendant terminated Plaintiff's employment in retaliation for facilitating an employee's complaint of racial discrimination and for opposing the unlawful, discriminatory termination of that employee.

87. Plaintiff has been significantly damaged both financially and emotionally due to Defendant's unlawful actions.

**COUNT IV**
**RETALIATION (42 U.S.C. § 1981)**

88. On or around February 25, 2025, Plaintiff and another HR colleague, Burns, met with an employee of Defendant, Valrie, regarding Valrie's complaints of racial discrimination.

89.    During the conversation, Burns told Valrie that he should contact the Employee Relations Manager, Jewett, and the HR Vice President, Parsons, to schedule a meeting about the racial discrimination.

90.    During Valrie's phone call with Jewett and Parsons, Plaintiff and Burns received messages from Jewett instructing them to terminate Valrie that day.

91.    Plaintiff and Burns told Jewett that Valrie's termination did not follow Defendant's disciplinary policy, and that Valrie would need to be issued a write-up and suspended first to be in alignment with Defendant's policy.

92.    Jewett told Plaintiff that she did not want to issue Valrie a write-up and suspension, and instructed Plaintiff and Burns to terminate Valrie anyway.

93.    Plaintiff and Burns terminated Valrie's employment according to Jewett's orders.

94.    During his termination meeting, Valrie asked if he had to sign the termination paperwork if he did not agree with it.

95.    Both Plaintiff and Burns told Valrie that he was not required to sign the termination paperwork if he did not want to.

96.    After this meeting, Jewett told Plaintiff that a formal complaint had been filed against him for not following company policy during the meeting and asked Plaintiff what he told Valrie.

97. Plaintiff explained that he terminated Valrie according to Jewett's instructions, and that he and Burns told him he was not required to sign the paperwork when he asked.

98. Burns confirmed Plaintiff's account of what happened during Valrie's termination meeting.

99. The following day, February 26, 2025, Jewett terminated Plaintiff, alleging poor performance and unprofessional conduct.

100. Prior to his termination, Plaintiff had never received any negative comments or disciplinary measures regarding his professionalism.

101. Defendant terminated Plaintiff's employment in retaliation for facilitating an employee's complaint of racial discrimination and for opposing the unlawful, discriminatory termination of that employee.

102. Plaintiff has been significantly damaged both financially and emotionally due to Defendant's unlawful actions.

**WHEREFORE,** Plaintiff respectfully requests this Court grant to Plaintiff the following:

A. Back pay for lost income and any other compensatory damages;

B. Reinstatement or front pay if the Court determines reinstatement is impractical;

C. Liquidated damages equal to the amount of back pay;

D.    Punitive damages;

E.    A reasonable attorneys' fee;

F.    Plaintiff's costs and expenses;

G.    Interest on all monies owed; and

H.    Any and all other relief the Court deems just and appropriate.

**PLAINTIFF DEMANDS TRIAL BY STRUCK JURY.**

Respectfully submitted on this the 6th day of April, 2026.

s/*Anthony D. Michel*
Anthony D. Michel (ASB-6809-064M)
Hannah C. Dillashaw (ASB-2048-K17W)
*Attorneys for Plaintiff*

**MICHEL ALLEN & SINOR**
1900 International Park Dr, Suite 140
Birmingham, AL 35243
Telephone: (205) 980-5700
Facsimile: (205) 994-2819
anthony@mas-firm.com
hannah@mas-firm.com

**PLEASE SERVE DEFENDANT VIA CERTIFIED MAIL AT THE FOLLOWING ADDRESS:**

Austal USA, Inc.
100 Austal Way
Mobile, AL 36602